STEVEN SCHNEIDER, individually and )
on behalf of all others similarly situated, )
                                      )
             Plaintiff, )      No. 14 C 01044
                                      )
        v. )
                                        )      Judge Edmond E. Chang
ECOLAB, INC., )
                                        )
           Defendant. )
                                        )

## MEMORANDUM OPINION AND ORDER

Earlier this year, the Court granted summary judgment against Steven Schneider's claim that his former employer, Ecolab, Inc., did not pay him and other "route sales managers" for overtime hours despite allegedly promising to do so, in violation of the Illinois Wage Payment and Collection Act (IWCPA), 820 ILCS 115/1 *et seq. See Schneider v. Ecolab, Inc.*, 2015 WL 1402615 (N.D. Ill. Mar. 25, 2015). The Court held that no reasonable jury could find that Ecolab had agreed to pay Schneider overtime, so the IWPCA claim was dismissed. Ecolab now moves for summary judgment against Schneider's remaining claim that Ecolab was obligated to pay overtime anyway under the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1 *et seq.*, which (unlike the IWCPA) does not require proof that an employer actually agreed to provide overtime wages; instead the statute itself requires overtime to be paid to qualifying employees.[1] Ecolab contends that Schneider never

---

[1]Subject-matter jurisdiction is secure because the parties are diverse (Schneider is an Illinois citizen, Ecolab is incorporated in Minnesota) and the amount in controversy

qualified for overtime pay because he was an "outside salesman" or, alternatively, a commissioned employee of a retail or service business, two categories that are expressly exempted by the IMWL. For the reasons set forth below, Ecolab's motion for summary judgment is denied.

## I. Background

Ecolab uses a business model it calls "value-adding selling." *See* R. 98, DSOF ¶ **44.**[2] Under this model, Ecolab leases sanitation equipment (like dishwashers customized with dispensers for Ecolab cleaning products) to commercial customers like restaurants and hotels, to whom Ecolab then provides regular maintenance and repair services. *See id.* ¶¶ 5, 8, 10, 33. The company uses these upkeep visits,

exceeds $75,000. The parties also invoke original (and therefore mandatory) federal jurisdiction over Schneider's proposed IMWL-class under the Class Action Fairness Act (CAFA), which requires minimal diversity, more than 100 class members, and an amount in controversy of at least $5 million. *See* 28 U.S.C. § 1332(d)(2). Whether this threshold is met is determined at the time of removal to federal court, even if some of the claims are later disposed of on the merits (as happened here with the IWCPA claim). *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 535 (7th Cir. 2011). When Ecolab removed this action from state court in February 2014, there was minimal diversity (between Schneider and Ecolab at the least) and 128 members in the putative IWCPA class with potential claims going back ten years, plausibly implicating more than $ 5 million in controversy. *See* R. 1, Not. Removal ¶¶ 12-13, 15. All that is required is a plausible allegation that the amount exceeds the minimum required, unless that allegation is contested. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014). It is not contested here. *See* R. 89, Parties' Joint Jurisdictional Mem. at 4. Further, while a district court has discretion to decline jurisdiction over a proposed class action in certain circumstances, it may only do so where "the primary defendants" are citizens of the State where the action was filed. 28 U.S.C. § 1332(d)(3). Ecolab, the sole defendant, is not a citizen of Illinois. Accordingly, jurisdiction under CAFA for a potential IMWL class is also secure.

[2]Citation to the docket is "R." followed by the entry number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Ecolab's Statement of Facts); "PSOF" (for Schneider's Statement of Additional Facts) [R. 106 at 55-63]; "Pl.'s Resp. DSOF" (for Schneider's Response to Ecolab's Statement of Facts) [R. 106 at 1-54]; and "Def.'s Resp. PSOF" (for Ecolab's Response to Schneider's Statement of Additional Facts) [R. 122]. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted. Certain documents attached as exhibits to Schneider's statements of fact and to Ecolab's response to them have been filed under seal.

carried out by "route sales managers," as important opportunities to keep abreast of customer needs and consult on additional sales of Ecolab products. *Id.* ¶ 45. Schneider was employed by Ecolab as a route sales manager between May 2008 and February 11, 2015. *Id.* ¶ 2.

This motion turns on two issues: what type of work the route sales managers performed in practice and how much Ecolab depended on their efforts, as opposed to outside distributors, to generate revenue. At this summary-judgment phase, the evidence on these questions is viewed in the light most favorable to Schneider, and all reasonable inferences are drawn in his favor as the non-moving party.

## A. Schneider's Duties

The parties agree that Schneider's job duties included making regular calls on his assigned clients (the calls are characterized as "preventative maintenance"), during which he visually inspected dishwashers, ran routine tests, and provided required maintenance and repairs. *Id.* ¶ 33. Each visit could last anywhere from 15 minutes to several hours. *Id.* ¶ 34. Schneider's territory included 80 to 90 accounts, and he was required to visit 50 to 60 of these, either monthly or once every three months depending on their size. *Id.* ¶ 35. In meeting these goals, Schneider was free to plan his own schedule and route, without set start, end, or break times. *Id.* ¶¶ 31, 32.

Where the parties disagree is the relative importance of sales during Schneider's client visits. Ecolab asserts that the "preventative maintenance" sessions were really "sales calls" during which Schneider was "always looking for

opportunities to sell … Ecolab products." *Id*. ¶¶ 36-37. Ecolab adds that at each visit, Schneider was expected to review customers' stocks of cleaning products and encourage orders for more. *Id*. ¶ 38. For each customer, Schneider was supposed to use a handheld electronic tablet to create "service detail reports," which noted inventory levels and explained how he had helped the client identify the benefits of additional Ecolab products. *Id*. ¶ 40. Ultimately, as the primary onsite representative, Schneider had to "pull through" on these opportunities and close sales. *Id*. ¶ 64. According to Ecolab, Schneider was required to attend monthly "knock-out" meetings at which new product offerings and sales techniques were discussed. *Id*. ¶ 86. All route sales managers received what Ecolab calls "commissions" on any products their customers purchased, regardless of whether the goods were delivered through Ecolab or not. *Id*. ¶ 137. Ecolab provides compensation figures for Schneider suggesting that much more than half his pay was in the form of these sales commissions. *See, e.g., id*. ¶ 113 (noting $49,002 in total pay in 2011, of which $29,905 was commissions); *id*. ¶ 116 ($47,448 total pay in 2014, of which $35,127 commissions).

Schneider does not deny that he created reports for each client visit (although he asserts that these reports were not sales tools), Pl.'s Resp. DSOF ¶¶ 40, 42, nor does he deny that he made *some* sales-related pitches—he repeatedly proffers that he "did not *regularly* engage in making sales to his account," *id*. ¶ 39 (emphasis added). But he does downplay his role in Ecolab's sales process. Schneider states that most of his customers placed orders through distributors or according to preset

lease agreements sold by Ecolab corporate-account executives, not through him; he rarely interacted during calls with any of his clients' employees who had purchasing authority, because those particular employees were often not on-site. *Id.* ¶ 37. Indeed, adds Schneider, he was told not to interfere with existing distributor and corporate account sales. *Id.* ¶ 38. As for the sales meetings, Schneider contends that their primary focus, at least for him, was to go over route planning and "coverage and maintenance" issues. *Id.* ¶ 86. Schneider, while not disputing the compensation figures proffered by Ecolab, does contest whether the purported commissions were in fact bona fide commissions tied to sales. *See, e.g.*, *id.* ¶¶ 113, 116.

In sum, the parties' factual contentions about how Schneider spent his time while at customers' locations are night-and-day. Ecolab states that 90% of his job activities were focused on retaining and increasing sales, while Schneider says 80 to 90% of his job was carrying out maintenance work. *Compare* DSOF ¶ 43 *with* Pl.'s Resp. DSOF ¶ 43.

### B. Distributors and Ecolab Revenues

It is undisputed that restaurants, hotels, and other businesses in the food and hospitality industries are the main users of Ecolab products. DSOF ¶¶ 5, 6. What *is* disputed is how these customers typically acquire Ecolab products. Ecolab asserts that 75% of its annual revenue is generated from its sales of products and services directly to its customers. *Id.* ¶ 7. Schneider, by contrast, contends that at least half of Ecolab's annual sales are to distributors, which purchase Ecolab

chemicals and other products before reselling them to commercial clients which have distributor accounts in place. Pl.'s Resp. DSOF ¶ 7.

For its part, Ecolab acknowledges the existence of distributors but characterizes them as "essentially being a delivery service," receiving a fee from Ecolab for facilitating orders. DSOF ¶ 135. According to Ecolab, it "still owns the direct relationship with the customer" (whatever that means), including setting the price that the end customer pays for Ecolab products, regardless of the source. *Id.* ¶ 136. Schneider counters that distributors provide more than just delivery services; instead, the distributors take direct orders from customers for Ecolab products that the distributors have already bought from Ecolab. Pl.'s Resp. DSOF ¶ 135. Some of these distributors, Schneider adds, even employ their own salespeople. *Id.* ¶ 136.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a

form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Illinois wage law, like federal wage law, requires that employers compensate their employees for work over 40 hours a week at one-and-a-half times their regular rate. 820 ILCS 105/4a. Several categories of workers, however, do not have a right to overtime under the IMWL; Ecolab argues that Schneider falls under at least one of two such exemptions. It is Ecolab's burden, as the party seeking the safe harbor of an exemption from wage-and-hour requirements, to demonstrate any applicable exemption by a preponderance of the evidence. *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 93 (2008); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010). *Accord Wilkins v. Just Energy Grp., Inc.*, — F.R.D. —, —, 2015 WL 1234738, at *5-6 (N.D. Ill. Mar. 13, 2015) (applying standard to IMWL). As discussed below, when the evidence is viewed in the light most favorable to Schneider (as required by the summary-judgment standard), a reasonable jury could reject the applicability of either exemption.

## A. Outside Salesman

The first category of exempt employees Ecolab relies upon is the so-called outside-salesmen exemption. *See* 820 ILCS 105/3(d)(4) (excluding outside salesmen from statutory definition of employee). The IMWL defines an "outside salesman" as "an employee regularly engaged in making sales or obtaining orders or contracts for services where a major portion of such duties are performed away from his employer's place of business." 820 ILCS 105/3(g).[3] The federal Fair Labor Standards Act (FLSA) provides for an analogous exemption, which, as will be described, provides a helpful reference. *See* 29 U.S.C. § 213(a)(1) (exempting "any employee employed … in the capacity of outside salesman").

The Supreme Court has explained that this exemption "is premised on the belief that" outside salespersons "'typically earned salaries well above the minimum wage' and enjoyed other benefits that 'set them apart from the nonexempt workers entitled to overtime pay.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2173 (2012) (quoting preamble to the FLSA). Exempting such workers makes sense because their labor (which presumably involves cultivating "outside" customers according to independently-set schedules) is "difficult to standardize to any time frame" (in comparison to, say, the 9-to-5 employee who works entirely on site) and "[can]not be easily spread to other workers after 40 hours in a week." *Id.* (noting that encouraging employers to spread out work to more individuals is a goal of overtime wages, but that salespersons "perform[ ] a kind of work … that

---

[3]There appears to be no real dispute about whether Schneider meets the second element of this definition, namely, that he performed a major portion of his duties away from Ecolab's place of business.

generally preclud[es]" such job expansion). By the same measure, the exemption is less likely to apply if the work is less sales-oriented and comprised more of non-sales duties; if the hours worked are more within a fixed time frame; and if the pay is lower, even if the purportedly exempt employee works entirely outside the employer's place of business. *See generally Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 470 (1948) ("[S]pread of employment is not the sole purpose of [the overtime premium]. Its purpose is also to compensate an employee in a specific manner for the strain of working longer than forty hours."); *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 510 (7th Cir. 2007) (overtime provision meant not only "to spread work in order to reduce unemployment," but "to discourage … a degree of overtime that might impair workers' health or safety, and to increase the welfare of low-paid workers").

## 1. Illinois Authority is Inconclusive

To determine whether Schneider was an outside salesman under the IMWL, the Court would ordinarily apply Illinois law as interpreted by the Illinois Supreme Court. *See Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000). The only relevant published authority, however, appears to be a two decade-old decision by an intermediate appellate court, *DeWig v. Landshire, Inc.*, 666 N.E.2d 1204 (Ill. App. Ct. 1996). Where the state supreme court has not spoken on an issue, federal courts may look to "the decisions of the state's intermediate appellate courts," which are "authoritative" absent any "compelling reason to doubt that they have stated the law correctly." *AAR Aircraft & Engine Grp., Inc. v. Edwards*, 272 F.3d 468, 470

(7th Cir. 2001) (citations omitted). Ultimately, where "state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way." *MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 655-56 (7th Cir. 2000) (citations omitted). Ecolab argues that *DeWig* dictates that Schneider must be considered an outside salesman. The Court disagrees because, as detailed below, *DeWig* does not provide enough analysis to understand how to apply that precedent to other cases.

The plaintiff in *DeWig* was a route salesman who delivered delicatessen food to various retail outlets; his daily duties involved restocking customer shelves, determining amounts owed and collecting payment, and soliciting additional shelf space for his company's products during his delivery visits, as well as administrative tasks like performing inventory work back at the company depot. 666 N.E.2d at 1205. A two-justice majority of the appellate court (one justice dissented) concluded that these activities fell "within the stated definition" of outside salesman under the IMWL. *Id*. at 1206. The majority opinion's analysis is not thoroughly explained; the takeaway appears to be that an employee who does at least some work related to sales each day, even if it is not the entirety (or even necessarily most) of the job, may be considered to be "regularly engag[ing] in making sales or obtaining orders" as required by 820 ILCS 105/3(g)—in other words, someone who is "more of a hybrid between a deliveryman and a salesman" qualifies for the exemption. 666 N.E.2d at 1206. That much makes sense (a task that is performed daily, though it may take all of five minutes, is still done

*regularly*), but some important questions were left unanswered by the majority opinion.

First, *DeWig* does not actually articulate a general analytical framework for determining what specific tasks, or other factors, constitute "making sales" and "obtaining orders" as defined by IMWL, even setting aside the question of whether that work was done regularly.[4] For instance, is a repairman a "hybrid" salesman if his job duties include encouraging, in passing, a customer to buy more stock even if he has no role in actually processing orders? Second, it is also unclear from *DeWig*'s concise discussion whether the majority would have conceived of any point at which a hybrid worker's sales-related tasks become so minimal or tangential that the exemption is no longer applicable.

So, as another federal court in this District recently concluded, *DeWig*'s holding can practically only be applied to its particular factual circumstances. *See Wilkins*, 2015 WL 1234738, at *6-7 (noting lack of "detailed explanation" in *DeWig*'s majority opinion before distinguishing it on factual grounds). Of the specific job activities listed by *DeWig*, the only ones that can be said to be sales-related (and thus relevant in determining that the exemption applies) are that, on a daily basis at each store, the deliveryman "determined what was needed and billed the outlet

---

[4]Unlike federal courts, which, as discussed below, consider factors like the relative importance of commissions in an employee's remuneration and her levels of supervision as clues as to whether she is a salesperson, the majority declined to take up considerations like "commission potential or employer control." *DeWig*, 666 N.E.2d at 1206. The dissent, by contrast, noted that the plaintiff received only a guaranteed base pay most weeks, despite potential for commissions. *DeWig*, 666 N.E.2d at 1208 (commenting that a factfinder could reasonably infer therefore that supposed sales commissions were really a non-factor and job was not actually tied to "salesmanship skills").

accordingly" and "*alone* solicited his product and completed the transaction with his customers." 666 N.E.2d at 1206 (emphasis added). The majority opinion also noted (in the factual-background section of the opinion) that DeWig attended occasional sales meetings and once participated in a sales contest. *Id*. at 1205.

In this case, when the facts are viewed in Schneider's favor, the same things cannot be said about Schneider, whom Ecolab tries to paint as an analogous repairman-salesman hybrid (if not an outright salesman). Ecolab does not point to record evidence that Schneider himself, unlike the salesman in *DeWig*, processed bills and payments. Indeed, Ecolab acknowledges that it has a company customer service center, located in Eagan, Minnesota, that actually "processes all sales," "takes orders," and "processes invoices." DSOF ¶ 130 (citing R. 99-4, Moechnig Decl. ¶ 27). Moreover, Schneider directly refutes that he played any meaningful (and certainly not the sole) role in soliciting sales, which according to him, were placed either with distributors or with Ecolab account executives who manage pre-existing lease agreements. Pl.'s Resp. DSOF ¶ 38 (citing Schneider's affidavit). Ecolab's only response to these assertions is competing testimony and an affidavit from one supervisor, to the effect that Schneider's role was to encourage sales and use his maintenance visits as sales opportunities. *See* DSOF ¶ 38 (citing in part deposition and affidavit of a District Manager). At the summary-judgment stage, however, the Court cannot resolve the competing testimony in Ecolab's favor. And although Ecolab proffers that Schneider had to attend monthly sales meetings, Schneider asserts that, as far as he was concerned, the focus of these meetings was to discuss

"coverage and maintenance." *Compare* DSOF ¶ 86 *with* Pl.'s Resp. DSOF ¶ 86 (both citing Schneider's deposition transcript). In sum, there is an obvious factual dispute about the nature of Schneider's activities on the job. *See Wilkins*, 2015 WL 1234738, at \*7-8 ("[f]act questions exist about whether the door-to-door workers … made sales or obtained orders" in face of evidence that it was the employer-company that, unlike in *DeWig*, actually "had unlimited authority" to set and modify sales agreements). That factual dispute precludes summary judgment, even to the extent that it is sought on the basis of analogy to *DeWig*'s sparsely worded analysis.

### 2. Guidance from Federal "Primary Duty" Standard

Given that *DeWig*, the only relevant Illinois precedent, does not settle the matter, the Court must turn elsewhere for guidance.[5] "When … there is an absence of Illinois case law interpreting an Illinois wage statute, a court may look for guidance to federal cases interpreting an analogous federal statute, namely the Fair Labor Standards Act." *Lewis v. Giordano's Enterprises, Inc.*, 921 N.E.2d 740, 745 (Ill. App. Ct. 2009) (looking to federal case law to determine whether certain releases of wage claims are void under IMWL). *See also, e.g., Haynes v. Tru-Green Corp.*, 507 N.E.2d 945, 951 (Ill. App. Ct. 1987) (interpreting punitive damages provision of IMWL to be parallel to similar FLSA analogs); *Bernardi v. Vill. Of N.*

---

[5]Since the issue of the scope of the exemption remains relatively ill-defined under state law, the Court would ordinarily have relinquished jurisdiction over the IMWL claims were its jurisdiction premised solely on diversity, and thus discretionary. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907-08 (7th Cir. 2007) (dismissal proper because of presence of "unsettled" state law issues). As discussed, however, *see supra* n.1, the parties assert jurisdiction under CAFA as well, making the Court's jurisdiction over the action original and mandatory. *See In re Repository Techs., Inc.*, 601 F.3d 710, 721 (7th Cir. 2010).

*Pekin*, 482 N.E.2d 101, 102 (Ill. App. Ct. 1985) (relying on United States Supreme Court precedent, the FLSA, and federal labor regulations to determine whether police dispatchers were entitled to wages when working from home under the IMWL). The Illinois Administrative Code also affirmatively recognizes FLSA-related regulations promulgated by the United States Labor Department as appropriate "guidance in the interpretation of" the IMWL. 56 Ill. Admin. Code § 210.120 (state agency "may refer to" federal regulations). Accordingly, the Court adopts the framework for defining an outside salesman outlined by federal law, predicting that the Illinois Supreme Court wound endorse that approach.

### a. Weigh "Job as a Whole"

The FLSA itself does not define "outside salesman," instead delegating that authority to the Labor Department. *See* 29 U.S.C. § 213(a)(1). The Labor Department has accordingly promulgated three definitional regulations. *See generally Christopher*, 132 S. Ct. at 2162-63. The first says, in relevant part, that an outside salesman is any employee "whose primary duty is (i) making sales within the meaning [the FLSA],[6] or (ii) obtaining orders or contracts," and "[w]ho is customarily and regularly engaged away from the employer's place or places of business." 29 C.F.R. § 541.500(a). The second confirms that under the FLSA, sales "include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property" as well as "obtaining orders or

---

[6]"'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).

contracts for services." 29 C.F.R. § 541.501(b)-(c).[7] Finally, the third identifies "promotion work" as "exempt outside sales work," as long as it is "actually performed incidental to and in conjunction with an employee's own outside sales or solicitations." 29 C.F.R. § 541.503(a). Importantly, however, "promotional work that is incidental to sales made, or to be made, by *someone else* is not exempt outside sales work." *Id*. (emphasis added)

To determine whether Schneider's "primary duty" was "the performance of exempt work," the relevant inquiry is whether making sales or obtaining orders was his "principal, main, major or most important duty." 29 C.F.R. § 541.700(a). The time split between sales and non-sales is one circumstance to consider as "a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). But the time spent on sales work is "not the sole test"; in other words, employees need not be engaged in sales for at least "50 percent of their time" or any other cut-off to "satisfy the primary duty requirement." *Id*. (This point dovetails with the conclusion gleaned from *DeWig*, namely, that in the case of employees who do both sales and non-sales work, "regularly" engaging in sales need not be the same as *exclusively* or even *mostly* engaging in sales.) Thus, in place of any bright-line test, "[d]etermination of an employee's primary duty must be based

[7]Again, there is no apparent dispute over whether Schneider was engaged in work regularly away from Ecolab's place of business. In addition, the parties do not appear to dispute that the "sales" at issue in this case constituted transfer of the requisite tangible and valuable property.

on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).[8]

Applicable factors under this all-circumstances approach are not limited to any exhaustive, pre-determined list. Instead, Labor Department regulations provide a start: "the relative importance of the exempt duties," "the amount of time spent performing exempt work," and "the employee's relative freedom from direct supervision," to name a few. *Id*. Courts have identified still others, with some overlap with the regulations: "whether an employee's compensation is based wholly or significantly on commission" and "whether an employee independently solicits new business," for instance. *Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F. Supp. 2d 928, 935 (W.D. Wis. 2009) aff'd, 599 F.3d 626 (7th Cir. 2010) (surveying cases from other circuits).[9]

---

[8]The dissent in *DeWig* advocated using this federal standard for outside salesman for IMWL purposes, given the similarity in purpose and structure of the two statutes, and would have applied a "primary function" test (as suggested by the federal regulations) that: "consider[s] the nature of the job as a whole, taking into account the actual amount of time a route salesman spends performing various sales and non-sales duties, the amount of autonomy an employee has in making sales transactions, and whether the employee's compensation is tied to his sales ability." 666 N.E.2d at 1208 (dissenting opinion) (collecting federal cases). It is worth noting that the federal "promotion work" regulation specifically provides the example of an employee whose circumstances sound very similar to the plaintiff's in *DeWig*, stating that a worker who "visits chain stores, arranges the merchandise on shelves, replenishes stock … but does not obtain a commitment for additional purchases" is not exempt. 29 C.F.R. § 541.503(c) (explaining that to be exempt, such stocking and shelving work must be "incidental to and in conjunction with the employee's own sales" and "direct efforts toward the consummation of a sale"). The plaintiff in *DeWig*, however, arguably would have been exempt even under this regulation because he did obtain a commitment for purchases by closing the deal on sales (billing and collecting payment) and soliciting more orders. *See Wilkins*, 2015 WL 1234738, at *7 (noting that his sales were "consummated on the spot").

[9]Ecolab identifies certain "external indicia" that are also relevant to identifying outside salesmen under FLSA. Def.'s Br. at 17-18. These indicia derive from the Supreme Court's recent decision in *Christopher*, which mentions whether employees were "hired for

### b. Genuine Issue of Fact Whether Schneider Was a Salesman

Anticipating that the Court might look to federal law, Ecolab argues that under the applicable federal regulations, Schneider was an outside salesman. But a reasonable factfinder could decide that Ecolab failed to prove that Schneider is an exempt salesman, especially when the facts are viewed in Schneider's favor. Rather than identify and then thoroughly the specific factors, Ecolab seeks to establish that Schneider meets the primary duty test mainly by relying on a comparison to *Schmidt*. There, the district court found that a salesperson of waste disposal services—who made unsupervised daily visits to customers according to her own schedule, was paid in commissions tied to her sales equaling close to a third of her entire pay, and was required to find new business at functions like Chamber of Commerce meetings—had a primary duty involving outside sales. *Schmidt*, 598 F. Supp. 2d at 936; Def.'s Br. at 15 (Schneider likewise "provided product expertise, evaluated his customer's needs, and sold Ecolab's chemicals and products to meet those needs.").

---

their sales experience," "trained to close each sales call by obtaining the maximum commitment possible," "worked away from the office, with minimal supervision" and "were rewarded for their efforts with incentive compensation" as relevant to being an exempted salesperson. 132 S.Ct. at 2172-73. Although Ecolab's brief suggests that they constitute a separate analytical category, these indicia are simply further iterations of possible factors that could be considered under the primary duty test—ones that happened to apply to the circumstances of the pharmaceutical salesmen in question in *Christopher*.

The one circumstance pointed to by Ecolab that seems to be uniquely articulated in *Christopher* alone is whether the employee was purposefully hired for her sales experience. On this issue too, there is a factual dispute for the factfinder to resolve: Ecolab asserts that Schneider was hired specifically for his sales experience, and Schneider asserts otherwise. *Compare* DSOF ¶ 14 (citing Schneider Tr. at 59-60) (confirming that on his job application, for a question that asked for the number of years of sales experience he had, he listed five to nine) *with* Pl.'s Resp. DSOF ¶ 14 (citing Schneider Tr. at 61-64) (clarifying that he explained that these years of experience were in carrying out construction/plumbing services, rather than pitching "sales").

But Ecolab has not shown that Schneider's role was in fact analogous to the employee in *Schmidt*. Although it is true that Schneider also made daily customer calls, and was relatively free of supervision and worked on his own time schedule, the record shows a yawning dispute, as discussed in the context of the *DeWig* comparison, on the sales-versus-maintenance nature of those calls. Schneider, taking the evidence in his favor, was a hybrid employee who did both sales and non-sales work, whereas the *Schmidt* plaintiff was unequivocally not: she occasionally handled customer complaints about her company's waste disposal containers, but her daily visits were made to explicitly solicit customers to purchase services and initiate contracts, *see* 598 F. Supp. 2d at 932-33, without any illusion of a side function like maintenance. (The crux of her argument was not that the calls were unrelated to sales, but that her other activities like developing marketing strategies were "promotional" and thus not exempt, an argument that the court rejected. *Id*. at 936.) Moreover, whether Schneider's pay was largely tied to sales-related commissions is, as will be addressed below, in dispute as well. And, it is certainly not beyond genuine dispute on the current record that Schneider had a business-growing role comparable to a representative tasked with frequenting Chamber of Commerce and similar functions to drum up new clients.

Ecolab unpersuasively tries to spin Schneider's own deposition testimony as admitting the dominance of the sales role in his work. For example, Ecolab asserts that Schneider admitted that 90% of his daily work was "designed to retain and increase sales." DSOF ¶ 93 (citing Schneider's deposition transcript). But, upon

review of the testimony, that is not what Schneider actually said: he confirmed that "about 90 percent of [his] work" was, in the words of the attorney posing the question, "in the restaurants, with [ ] customers, driving to and from those customers, and dealing with [ ] colleagues and/or customers about solutions for the customers." R. 99-1, Schneider Tr. at 172. Spending 90% of his time driving to and from customers and "dealing with" them does *not* mean Schneider spent 90% of his time dealing with them trying to *make sales* (as opposed to addressing maintenance issues). In fact, in another portion of the deposition that Ecolab cites, Schneider definitively stated that "sales is maybe 10 to 20 percent of the time that I spend in a call" (that is, during each customer visit, not even 10% to 20%of his total work time). *Id*. at 341.

Ecolab also contends that Schneider conceded that the "*only* reason he performed service was to Retain and Grow Ecolab sales," R. 97, Def.'s Br. at 16 (emphasis and capitalization in original), but again, not so. Schneider was asked if "*part* of the benefit of … being there for maintenance, etc., is it gets you that access … and it helps you build that relationship," to which he responded affirmatively. Schneider Tr. at 160-61 (emphasis added). It simply does not follow, as Ecolab then asserts, that Schneider thereby "admitted that *all* of his work in the field—100% of it, including service—was aimed at retaining, growing, and gaining sales." Def.'s Br. at 16 (relying on quoted deposition portion). Indeed, all that the deposition testimony shows is Schneider merely conceding that there is, naturally, some ancillary benefit to Ecolab's bottom line from its model of providing follow-up

maintenance services—but he most certainly did not concede Ecolab's view that *everything* about his work boiled down to sales.[10]

Instead, given Schneider's testimony (which must be accepted for now) that the orders he encouraged were really placed through Ecolab corporate executives who managed pre-set agreements that governed sales, there is a genuine issue of fact over whether Schneider engaged in non-exempt "promotion work." That is, there is enough for a jury to find that the sales pitches Schneider did make to his clients when repairing their Ecolab machines were merely "incidental to sales … to be made, by someone else." 29 C.F.R. § 541.503(a). The other cases that Ecolab raises in a string cite are distinguishable on this basis. In none does the purported salesman merely promote an order that is ultimately placed with another; *he* closes the deal, and no one else. *See Ackerman v. Coca-Cola Enterprises, Inc.*, 179 F.3d 1260, 1267 (10th Cir. 1999) (merchandisers did promotion work "incidental to" outside sales because *they themselves* "consummated" sales at retail stores they visited); *Reyes v. Goya Foods, Inc.*, 549 F. App'x 876, 878 (11th Cir. 2013) (sales broker filled own individual weekly sales goals); *Stevens v. SimplexGrinnell, LLP*, 190 F. App'x 768, 769, 772 (11th Cir. 2006) (plaintiff's providing undefined "service" was exempt from overtime because it was incidental to her own sales because *she*

_____

[10]In addition to these unpersuasive interpretations of Schneider's deposition, Ecolab, in its reply brief, asserts that other portions of his testimony directly contradict many of his statements of fact. R. 121, Def.'s Reply Br. at 2. Ecolab simply string cites a long list of statements and concludes, without any explanation, that these should be disregarded. Ecolab then similarly string cites to another list of statements, concluding, again without real explanation as to how or why, that these rely on inadmissible facts and should be stricken. *Id*. at 2-3. It should go without saying that such relief is unwarranted on the basis of Ecolab's merely presenting a list of allegedly questionable statements, none of which are quoted and are not accompanied by any meaningful explanation.

*herself* sold new sales proposals to clients); *Barth v. Champion Roofing Inc.*, 2011 WL 2395555, at *1 (N.D. Ill. June 10, 2011) (estimator given "sales leads" that he visited and closed out). Thus, Ecolab's contention that "Schneider need not personally communicate the order to make the sale," Def.'s Reply Br. at 8, misses the point; if what he was communicating was encouragement for a customer to place an order that is accrued by a corporate account executive or a distributor, that work is not "incidental to and in conjunction with [Schneider's] *own* outside sales or solicitations." 29 C.F.R. § 541.503(a) (emphasis added).

Schneider admitted that he played some role in facilitating customers' orders, an outgrowth of his relationship with them forged during the maintenance visits. Schneider Tr. at 199-200. But there is 180-degrees worth of disagreement between the parties about whether this facilitation involved fulfilling pre-existing commitments to buy that had already been secured by account executives, *see* PSOF ¶ 14 (quoting example agreement which states that customer pre-agrees to minimum purchases), or could be considered entirely new sales by and for Schneider, Def.'s Resp. PSOF ¶ 13 (asserting route sales managers can sell beyond account-determined products). Ecolab argues that Schneider effectively conceded the latter during his deposition, Def.'s Reply Br. at n.10, but once again that is an aggressive over-reading of the deposition. Schneider described one instance in which a customer desired a non-approved Ecolab product; Schneider conveyed this desire to the corporate account executive, who then "augment[ed] the contract" accordingly. Schneider Tr. at 260-61. Drawing inferences favorably to Schneider,

however, this limited story simply relates that Schneider facilitated a sale that the account executive then notched. Ecolab's citation to Schneider's testimony, describing how sometimes he would facilitate calls from his clients to the Ecolab service center, *see id*. at 199-204, is similarly inconclusive.

To sum up, with all reasonable inferences drawn in Schneider's favor, the record does not establish that Schneider's primary duty was making sales or obtaining orders—as opposed, for instance, to merely doing non-exempt promotional work as an incidental part of his routine maintenance visits. Neither party has submitted documentary or other extrinsic evidence that definitely reveals what Schneider's work entailed in actuality (that is, beyond formal titles and job descriptions on paper, as well as dueling assertions made by Schneider and Ecolab managers).[11] In that absence, what remains is a he-said, company-said about Schneider's activities, which were evidently some hybrid of doing maintenance work and using that opportunity to solicit sales. Where the truth lies must depend on the credibility determinations and factual findings of a jury, guided by the relevant circumstances described above.

### B. Commissioned-Employee of Retail or Service Establishment

The second overtime exemption that Ecolab invokes is one for certain employees who are paid by commissions. The IMWL, *see* 820 ILCS 105/4a(2)(F), expressly adopts Section 7 of the FLSA, which exempts from overtime any employee

---

[11]One source of evidence, which as far as the Court can tell Ecolab did not seek out, would have been a declaration or deposition testimony from some of the customers Schneider and other route sales managers visited. They could have provided an unbiased, non-party account of whether, and to what degree, these maintenance visits could be characterized as sales calls.

of a "retail or service establishment," provided that: "(1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate … and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). Schneider does not dispute that his effective rate of pay was more than 150% of the hourly minimum wage. He *does* contest whether his compensation could be considered as genuinely based in part on commissions, but (as explained later) he was indeed paid on a commission basis. More fundamentally, however, because Ecolab has not conclusively established that it is in fact a "retail or service establishment," summary judgment is denied on Ecolab's attempt to invoke this exemption as well.

### 1. Ecolab Has Not Shown That It Is A Retail Or Service Establishment

What constitutes a retail or service establishment is not defined by Section 7(i) of the FLSA. A corresponding Labor Department regulation provides that "[a]s used in section 7(i), … the term 'retail or service establishment' means an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411. Ordinarily, there would be little issue with relying on such a definitional regulation promulgated by the Labor Department to interpret the FLSA (as the Court did in examining the outside-salesman issue), but there is a hiccup in this particular case that requires some elaboration.

### a. The 75-Percent Standard has "Dubious Relevance"

Recently addressing the commissioned-employee exemption, the Seventh Circuit observed that the requirement that an employer directly sell as retail (as opposed to wholesale or otherwise vend to re-sellers) at least 75% of its goods and services is of "dubious relevance" in determining whether an employer is a retail or service establishment. *Alvarado v. Corporate Cleaning Servs., Inc.*, 782 F.3d 365, 371 (7th Cir. 2015). The Labor Department had underscored this very factor in an amicus brief in support of the plaintiff-employees in *Alvarado* but, for some reason, cited the requirement as it is set forth *not* in § 779.411, but in a separate regulation, 29 C.F.R. § 779.312. *That* regulation contains the identical "75 percent" language but, by its own terms, pertains *not* to Section 7(i) of the FLSA—the commission exemption—but Section 13(a)(2), which deals with an unrelated and since-repealed exemption for intrastate businesses. *See Alvarado*, 782 F.3d at 371. In the context of the intrastate-business exemption, the Seventh Circuit observed, the "75 percent" rule made sense: since "Congress's purpose [with Section 13(a)(2)] was [to] exempt local mom and pop stores" from the burdens of complying with labor legislation, capping wholesaling (presumably more likely to involve out-of-state commerce) to some degree would be consistent with the intrastate-business exemption's goal of ensuring that "most of the local stores' output … remain[s] within the state." *Id.* *Alvarado* suggested that, in the commission-exemption context, by contrast, such rationale did not apply, and criticized the Labor Department and other courts for

"woodenly port[ing] the definition from [Section 13(a)(2) and the intrastate-business context] to the commission exemption."[12] *Id.* (citing other Circuit cases).

But § 779.411 *does*, as explained above, apply the 75% requirement explicitly to the commissioned-employee exemption. (Indeed, a review of its amicus brief reveals that the Labor Department did cite to the on-point § 779.411, rather than the "ported" over § 779.312, but the citation was only in a string cite. *See* Brief of Amicus Secretary of Labor in Support of Plaintiffs-Appellants at 5-6, *Alvarado v. Corporate Cleaning Servs., Inc.*, No. 13-3818 (7th Cir. July 17, 2014), Dkt. No. 32.) The question, in any event, is what to make of the status of the 75% requirement after *Alvarado*; setting aside the confusion about the specific source-regulation, it is clear that the Seventh Circuit has expressed serious skepticism about its very premise.

For now, the key thing to note is that the 75% "not for resale" rule has not been directly repudiated (at least not yet). *Alvarado* focused on a purely qualitative analysis to determine what counts as a retail or service establishment: the employer in that case qualified both as a "service" and a hybrid "retail service" establishment, the Seventh Circuit reasoned, because it sold window-cleaning services to building owners who did not in any way "resell the window cleaning"—that is, these clients, even if their individual building tenants then received the cleaning that they

_____

[12]In criticizing the requirement, the Seventh Circuit also criticized the Labor Department's citation of another, even more clearly "intrastate business"-focused regulation, one defining a retail or service establishment as one that "serves the everyday needs of the community in which it is located." *Alvarado*, 782 F.3d at 371 (quoting 29 C.F.R. § 779.318). That concern, of course, is of even less relevance in the context of the general commissioned-employee exemption.

purchased, were the company's "ultimate customers" and no one else. *See Alvarado*, 782 F.3d at 369 (holding that employer was not therefore a wholesaler). In other words, because there was no hint that any of the employer's sales was anything but to end-consumer retail of services, the court did not need to evaluate any definitive quantitative standard (if one should exist) for how much a company can engage in some wholesaling, before it loses its "retail or service" status. *Id*. at 371 (noting that the employer thus would not have "fail[ed] to satisfy" the 75%-requirement, had that particular quantitative standard been applied). Thus, any criticism of the specific 75%-standard was not necessary to the decision and is not binding.

All to say, the 75% "not for resale" threshold is still a presumably valid source of law, although the Seventh Circuit has certainly laid it open for criticism.[13] For this Court to formally discard 29 C.F.R. § 779.411, the challenging party would have to overcome whatever deference must be afforded to the regulation under administrative-law principles. On an initial, cursory review, it appears that this burden is likely to be high, specifically the deference to duly promulgated agency rules owed under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (Labor Department regulations that fill statutory gap such as an undefined term in the FLSA owed *Chevron*-deference and presumed "legally binding" unless

---

[13]Indeed, it is easy to envision at least one way in which the 75%-rule may require explanation. Consider the example of a company that has a large retail sales division as well as a considerable but separate wholesale operation as well. It does not make particular sense that, by virtue of § 779.411, this employer is not allowed to pay solely its retail-division workers on an overtime-exempt commission-basis, because when considered as an "establishment" on the whole, it makes, say, 26% of revenue from the un-related wholesale division.

patently unreasonable).[14] *Alvarado* did not need to grapple with the specifics of what deference the 75% rule is owed and, if none, what standard should take its place. The parties here, on the other hand, might have to, as the Court now explains.

### b. Some of Ecolab's Sales May Not Have Been Retail in Nature

The reason the parties might have to tackle head-on the relevance of the 75% requirement is that Ecolab has failed to establish that its products and services were not intended for resale. Ecolab asserts that all of its "revenue comes from its myriad cleaning and sanitation services and products," sold to business customers in the "restaurant, hotel, food service, and hospitality industries" who are "ultimate customers." Def.'s Br. at 20 (comparing itself to the window-cleaning company in *Alvarado* as selling only to end-users). But Schneider directly controverts that assertion, by pointing to Ecolab's use of distributors.

Schneider asserts that these distributors were separate retailers who bought and then resold Ecolab products, sometimes to the same customers as Ecolab. Pl.'s Resp. Br. at 16-17 (citing PSOF ¶¶ 14, 15). Schneider relies in part, as he may, on his own first-hand knowledge of his customers' purchasing practices in support of this contention. R. 106, Exh. 1, Schneider Decl. ¶ 13. But he also points to the deposition testimony of Ecolab's Director of Finance, Institutional Field Sales

---

[14]At least two other circuits have applied the definition of retail or service establishment as laid out by § 779.411 without hint of criticism. *See Gieg v. DDR, Inc.*, 407 F.3d 1038, 1047 (9th Cir. 2005) (noting that when Congress adopted Section 7(i) in 1966, it affirmatively intended the meaning of "retail or service establishment" to have same meaning as in other exemptions elsewhere in the FLSA); *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993).

Operations, who conceded that "when Ecolab sells a product to a distributor, that is a sale of the product and that the ownership of the inventory transfers to the distributor." Moechnig Tr. at 136. Transferring ownership over a product to a third party that then assumes the liability of having to distribute that product sounds like a wholesale transaction, not retail. What's more, Schneider highlights a purported PowerPoint slide used by Ecolab for training purposes that includes the information that "Distributors represent 50% of Ecolab's *sales*." R. 106, Exh. 3, Distributors' Slide (emphasis added).

Ecolab responds that its "[d]istributors act as a delivery service for Ecolab, not as retailers of Ecolab's products." Def.'s Br. at n.20. Yet it offers nothing to substantiate this characterization, which is odd: it should be easy to show that these distributors simply provided delivery services, as asserted, by proffering documentary evidence in the form of service agreements, invoices, and the like, all presumably in Ecolab's possession. Instead, Ecolab rests on nothing but its own characterization that the distributors—identified by an Ecolab district manager as companies like "Sysco," "U.S. Foods," "Guest Supply," "Performance Food Group," R. 99-5, Jensen Tr. at 157—acted as the equivalent of a delivery truck, nothing more. This is simply not enough to win summary judgment. "Delivery service" is a vague term in this context, and does not close the book on the issue of retailing. A commodity broker or other middleman, for instance, could well assume title (and with it, the risk of not being able to offload the inventory) to products from a manufacturer, yet still be said, accurately, to facilitate physical delivery of the goods

as well to a customer once one is found. Ecolab offers nothing to allow the Court to assess what it means by "delivery service" in its case, even though, remember, the company has the burden to establish the elements of any applicable overtime-exemption.

Because there is a factual dispute about whether some part of Ecolab's sales-business was in wholesaling (perhaps even to a half of its business), Ecolab cannot simply analogize to *Alvarado* on the retail or service establishment issue. The question about the role of its distributors, which the evidence shows might represent half of Ecolab revenue, forestalls any summary judgment on the issue in Ecolab's favor. What's more, to win at trial, Ecolab (unless it can definitively show at trial that the distributors in no way resold its products) will have to establish that it was a qualifying establishment under Section 7(i) notwithstanding some degree of non-retail sales. As trial approaches and the parties prepare instructions for the factfinder, the parties must be prepared to brief the issue of what deference is owed to 29 C.F.R. § 779.411 and the 75% "not-for-resale" requirement.[15]

## 2. Schneider Was Paid In Bona Fide Commissions

Although the material issue of fact over the first element of whether Ecolab was a retail or service establishment precludes summary judgment, Ecolab has at least established one element of the commissioned-employee exemption: Schneider did receive more than half his pay from commissions. Schneider does not dispute figures from Ecolab showing that over 50% of his compensation was derived from

---

[15]This briefing should also address the regulation's requirement, beyond the 75% rule, that the sales in question be "recognized as retail sales or services in [the employer's] particular industry," 29 C.F.R. § 779.411, a factor that the Court did not have to reach here.

"commissions" for each year from 2011 to 2014.[16] Although Schneider does dispute whether these commissions were actually cognizable for purposes of the exemption, his contention is without merit.

Schneider relies on a Labor Department regulation that gives as one example of a commission plan that "would not be considered [ ] bona fide":

> one in which the employee receives a regular payment constituting nearly his entire earnings which is expressed in terms of a percentage of the sales which the establishment or department can always be expected to make with only a slight addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota.

29 C.F.R. § 779.416(c). Schneider argues that his pay scheme fits this example of not-really-a-commission: the existence of pre-set lease agreements that actually governed Ecolab orders meant that he too could "always be expected to make a certain level of sales"; moreover, Ecolab engaged in a "constant realignment of accounts based on factors including sales volume … to keep Schneider and other [route sales managers'] compensation at roughly equal levels, which is at odds with a bona fide commission system." R. 104, Pl.'s Resp. Br. at 17-18. Schneider's reliance on this example is misplaced.

Nowhere does Schneider dispute the fact that his ultimate compensation was tied to the volume of sales for accounts in his territory; he only questions whether he played anything more than a tangential role in generating those sales. But, unlike for the outside-salesman analysis, the commissioned-employee exemption

---

[16]These numbers are: for 2011, $49,002 total pay/$29,905 in commissions; for 2012, $53,541/$33,595; for 2013, $53,900/$34,519; and for 2014, $47,448/$35,127. DSOF ¶¶ 113-16. There is no dispute that each of these years represent the adequate "representative period" of more than one-month. 29 U.S.C. § 207(i)(2).

does *not* require that the employee have played any kind of "primary" role (or any role at all) in making the sales upon which the commission is calculated. "The essence of a commission is that it bases compensation on sales," such as in the form of "a percentage of the sales price," meted out to employees who provided labor on the underlying good or service that has been sold. *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007) (upholding as a valid commission payment method to a "team of mechanics" with different roles and skills, assigned to jobs that have already been priced and sold to the customer). Even assuming Schneider had little or next to no actual sales responsibilities, it makes no difference so long as his pay rose and fell according to the overall volume of sales in his territory (which would have been affected by the work of numerous types of Ecolab personnel working on those accounts in different capacities). What is crucial is that his pay was, at the same time, "decoupled from actual time worked," the primary feature of commission-based pay. *Id*. at 509. Although the parties spar over what his work entailed, it is uncontested that the pay for that work was decoupled from labor-time.

Schneider highlights that Ecolab readjusted territory assignments to ensure that route sales managers received "compensation at roughly equal levels," but this fact does not by itself render the commissions illusory. Ecolab explains that it re-zoned territories to ensure greater sales potential and maximize sales among the various route sales managers. Def.'s Resp. PSOF ¶ 27. In other words, Ecolab did not wish to consign some route sales managers to dead-end territories with sagging

markets while letting others continue to benefit from booming ones forever. Trying to roughly equalize *potential* among team members by periodically re-creating districts to have comparable opportunity in this way is not the same as a scheme creating a *guarantee* of sales that "can always be expected." As the leading portion of 29 C.F.R. § 779.416(c), which Schneider omits, explains, "A commission rate is not bona fide if the formula for computing the commissions is such that the employee, in fact, always or almost always earns the *same fixed amount of compensation* for each workweek." (emphasis added). Schneider's pay was never fixed in the manner contemplated by the regulation. The range in his commission pay, from just under $30,000 to over $35,000 in different years, DSOF ¶¶ 113-16, reflects not a guaranteed or fixed rate but a variation perfectly consistent with the territory readjustments the parties describe.[17]

Consequently, Schneider fails to show a genuine issue over whether he the majority of his pay was via commissions. Ecolab therefore has met its legal burden of establishing, at least, the element of the commissioned-employee exemption requiring that more than half of Schneider's compensation was in the form of bona fide commissions.[18]

---

[17]Schneider makes much hay of the fact that he made more in 2013 than in 2012 in commissions, despite the fact that Ecolab's sales went down in absolute terms in the same period, arguing that this discrepancy proves that Ecolab's commissions were not actually tied to sales. Pl.'s Resp. Br. at 18. This conjecture can be dismissed out of hand: an increase in per-unit prices for the products sold that year could easily explain this outcome.

[18]Ecolab brings up one final point to underscore its argument that Schneider's job met Section 7(i)'s requirements, namely, a contention that Schneider was not the type of worker that the IMWL was designed to protect as a policy matter. Def.'s Br. at 24-25. Given Ecolab's failure to establish that it meets the "retail or service" establishment requirement

# IV. Conclusion

For the reasons described above, Ecolab has failed to satisfy its burden of showing that Schneider was not owed overtime pay as a matter of law. First, on the question of the outside-salesman exemption under the IMWL, for which the federal "primary duty" analysis applies, there is conflicting evidence about the actual nature of Schneider's work activities. Second, on the IMWL's commissioned-employee exemption, although Ecolab has established that Schneider was paid in bona fide commissions, there is a material issue of fact about whether Ecolab was a qualifying retail or service establishment (the governing standard for which is potentially unsettled). Ecolab's motion for summary judgment is therefore denied. At the next status hearing, the parties must be prepared to state whether they want a settlement conference referral, or if instead is it time to very promptly pursue class-certification discovery.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 3, 2015

---

as a matter of law on other grounds, the Court need not engage these abstract, public policy-oriented arguments.